UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARLENY GONZALEZ,

        Plaintiff,

    v.                             Civil Action No. 13-11772
                                     Honorable Linda V. Parker

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF No. 13] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 14]

In this action, Plaintiff appeals the denial of her application for disability insurance benefits and supplemental security income by the Commissioner of Social Security ("Commissioner"). (*See* ECF No. 1.) Before this Court are the parties' cross-motions for summary judgment. (ECF Nos. 13, 14. ). For the reasons set forth below, the Court finds that the Commissioner erred in the decision finding Plaintiff not disabled within the meaning of the Social Security Act. The Court therefore grants Plaintiff's Motion for Summary Judgment, denies the Commissioner's Motion for Summary Judgment, reverses the decision denying Plaintiff's application for benefits, and remands the matter to the Commissioner for further proceedings consistent with this Opinion and Order.

## I.    Procedural Background

Plaintiff filed her application for disability insurance benefits and supplemental security income on August 29, 2007, alleging disability beginning October 30, 2005.

After Plaintiff's claims were denied initially on January 25, 2008, she requested a hearing before an Administrative Law Judge ("ALJ"). ALJ James P. Alderisio conducted a hearing on November 5, 2009. On May 6, 2010, ALJ Alderisio issued a decision adverse to Plaintiff.

The Social Security Administration's Appeals Council ("Appeals Council") granted Plaintiff's request for review, vacated ALJ Alderisio's decision, and remanded the matter for further proceedings. Plaintiff was afforded a new hearing before ALJ Myriam C. Fernandez Rice on December 8, 2011. Plaintiff appeared at the hearing with her counsel. Plaintiff and a vocational expert, James Lozer, testified at the hearing.

On December 14, 2011, ALJ Fernandez Rice issue a decision adverse to Plaintiff. (R. 13-25.) That decision became the final decision of the Commissioner on February 28, 2013, when the Appeals Council denied Plaintiff's request for review. (R. 1-3.) Plaintiff filed this suit on April 19, 2013. (ECF No. 1.)

## II.    Medical Evidence

Plaintiff's medical records reflect continued treatment for complaints of low back pain, numbness associated with nerve compression, depression, and anxiety.

### A.    Physical ailments

Treatment records from Springwells Clinic in Detroit, Michigan, dated December 8, 2006 through August 28, 2007, reflect Plaintiff's complaints of low back pain and numbness. (R. 303-12.) The notes are largely illegible, but reflect prescriptions for Vicodin, Lorcet, Lyrica, Cipro, and Colace. (*Id*.) A CT scan of Plaintiff's lumbar spine

2

was conducted at Fairview Radiology on October 17, 2006, and is significant for "[m]inimal left paracentral L5 disc herniation causing minimal compression upon the central left S1 nerve" and "[m]inimal symmetric bilateral superior degenerative sacroiliitis." (R. 319.)

On October 23, 2007, Dr. L. Patel prepared a consultative examination report diagnosing Plaintiff with lumbar myositis [inflammation of a voluntary muscle] without evidence of radiculopathy [disease of the nerve roots]. (R. 345.) Dr. Patel reports that Plaintiff has experienced back pain for the past 14 years, which has progressively gotten worse. (R. 343.) He further reports that Plaintiff is independent in basic activities of daily living and personal care, specifically that she is able to get dressed, button her clothing, tie her shoelaces, pick up a coin and pencil, and write. (R. 343-44.) Dr. Patel indicates that Plaintiff is able to ambulate without a cane with a normal gait pattern, heel walk, toe walk, tandem walk, sit, stand, bend, stoop, squat, and carry, push, and pull up to ten pounds. (R. 344.)

Additional records from Springwells Clinic from December 2007 through October 2009 reflect continued care and medication management of Plaintiff's back impairments. (R. 454-85.) Notes dated April 3, 2008 document a positive straight leg raise test and record Plaintiff's complaints of a loss of sensation in her back and upper arm. (R. 480.) On July 11, 2008, weakness, numbness, and pain in Plaintiff's left leg and lower back are reflected. (R. 475.) Also reflected is Plaintiff's report that she is unable to do housework and shop for groceries. (*Id*.) Plaintiff complained of worsening pain on November 19,

3

2008.  (R. 470.)  An exam revealed lumbar spine tenderness and decreased range of motion.  (*Id*.)  Plaintiff's doctors continued to prescribe various medications for her pain during this period, including Vicodin, Lorcet, and Flexeril.

A non-examining State agency medical consultant, Dr. Muhammad Khalid, completed a form evaluating Plaintiff's physical residual functional capacity ("RFC") on December 5, 2007.  (R. 373-80.)  Dr. Khalid opined that Plaintiff had the capacity to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in an eight hour work day, and sit for about six hours in an eight hour work day.  (R. 374.)  Dr. Khalid concluded that Plaintiff should never climb ladders, ropes, or scaffolds, and should only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl.  (R. 375.)

Plaintiff's treating physician, Dr. Pauleena Singh, completed a State of Michigan Department of Human Services Medical Needs form on October 13, 2008.  On this form, Dr. Singh diagnosed Plaintiff with disc herniation with radiculopathy.  (R. 382.)  Dr. Singh indicated that Plaintiff has a medical need for assistance with meal preparation, shopping, laundry, and housework, and that she uses a cane.  (*Id*.)  According to Dr. Singh, Plaintiff could not work at her usual occupation or any job for one year.  (*Id*.)

Dr. Singh also completed a Physical RFC Questionnaire for Plaintiff on September 30, 2009.  (R. 448-52.)  Dr. Singh indicated that Plaintiff has had constant lower back pain radiating to the leg with varying severity and worsening with prolonged standing and sitting associated with disc herniation with radiculopathy.  (R. 449.)  Dr. Singh notes

4

tenderness and positive straight leg raise.  (*Id*.)  She identifies Plaintiff's prognosis as "fair[.]"  (*Id*.)

Evaluating Plaintiff's RFC, Dr. Singh indicated that during a typical work day, Plaintiff's experience of pain is severe enough to "frequently" interfere with attention and concentration needed to perform even simple work tasks.  (R. 450.)  Due to Plaintiff's additional anxiety disorder and inability to walk, sit, or stand for long periods of time, Dr. Singh appears to have opined that Plaintiff fluctuates between being capable and incapable of tolerating low stress jobs.[1]  (*Id*.)  Dr. Singh estimated that Plaintiff could walk one city block without rest or severe pain, sit for thirty minutes to one hour, stand for forty-five minutes to one hour, and sit and stand/walk for two to four hours in an eight hour work day with normal breaks.  (*Id*.)  Dr. Singh also opined that every sixty minutes during an eight hour work day, Plaintiff would require a ten minute period of walking, and that she requires a job that allows shifting positions at will from sitting, standing, or walking.  (R. 451.)  According to Dr. Singh, during an eight hour work day, Plaintiff needs two to three unscheduled breaks of approximately ten minutes and needs to elevate her legs for at least two hours if the position requires prolonged sitting.  (*Id*.)  With respect to Plaintiff's lifting capabilities, Dr. Singh indicated that she can occasionally carry less than ten pounds.  (*Id*.)  Dr. Singh further indicated that Plaintiff should never stoop or crouch/squat, rarely twist or climb ladders, can occasionally climb stairs, and has

---

[1]Dr. Singh checked the line for "[i]ncapable of even 'loss stress' jobs" and then drew an arrow to where she checked the line for "[c]apable of low stress jobs." (R. 450.)

significant limitations with reaching in that she can reach overhead only 20% of the time during an eight hour work day. (R. 451-52.) Dr. Singh estimated that Plaintiff would be absent from work as a result of her impairments about three days per month. (R. 452.)

Plaintiff eventually consulted with a neurosurgeon concerning her back pain on July 18, 2011, and was referred at that time to Dr. Hazem A. Eltahawy for consideration of a spinal fusion. (R. 538.) Dr. Eltahawy ordered an x-ray of the lumbar spine which was conducted on July 28, 2011. (R. 529.) The x-ray revealed progressive mild L4-5 and moderate L5-S1 disc space narrowing consistent with disc disease. (*Id*.) In light of Plaintiff's "intractable pain and difficulty with daily activities", Dr. Eltahawy recommended a lumbar discectomy and fusion. (R. 537.) The surgery was completed on October 14, 2011. (R. 527-28.)

Plaintiff saw Dr. Eltahawy for her first post-operative visit on October 27, 2011. (R. 533-35.) At that time, Plaintiff complained of continued pain in her back and right leg at the back of the thigh. (*Id*.) Dr. Eltahawy concluded that the pain was likely part of the healing process. (R. 535.)

No further reports concerning Plaintiff's physical ailments are contained in the record.

### B.    Mental impairments

Plaintiff presented to Southwest Counseling and Development Services ("Southwest Counseling") on May 2, 2006 for a psychological evaluation. (R. 334-337.) She was evaluated by a psychiatrist, Jaswant Purohit, M.D. (*Id*.) Plaintiff related

symptoms of anger, depression, isolative behavior, and anxiety attacks.  (R. 334.)
Plaintiff denied any suicidal or homicidal thoughts, but admitted to three suicide attempts
in the past.  (*Id*.)  Plaintiff indicated that she had been depressed since age fourteen, when
her mother's boyfriend raped her and she "lost the case" when it went to court.  (*Id*.)
According to the treatment notes, Plaintiff had been seen by Dr. Purohit at Southwest
Counseling in December 2001, when she complained of feeling depressed with panic
attacks.  (*Id*.)

 According to Dr. Purohit, at the May 2, 2006 appointment, Plaintiff was
cooperative, polite, verbal, and tearful at times.  (R. 335.)  He reported that Plaintiff's
mood was depressed and somewhat angry, but her speech was logical, productive, and
goal directed.  (*Id*.)  Plaintiff was alert and oriented to time, place, and person, and her
memory appeared to be fairly intact for all events.  (R. 336.)  Dr. Purohit diagnosed
Plaintiff with the following: major depressive disorder, recurrent; panic disorder without
agoraphobia; and post-traumatic stress disorder, prolonged.  (*Id*.)  He started Plaintiff on
Lexapro for her depression and Ativan for her insomnia and anxiety problems.  (*Id*.)

 Southwest Counseling treatment notes dated August 28, 2007 document that
Plaintiff's clinical status was "[w]orsening."  (R. 342.)  Plaintiff arrived late for her
appointment and reported feeling more depressed and having difficulty sleeping.  (*Id*.)
She stated that her increased depression was due to her son's recent arrest and her
inability to handle him anymore.  (*Id*.)  Dr. Purohit increased Plaintiff's Lexapro dosage
at this time.  (*Id*.)

Plaintiff failed to show for subsequent appointments on September 25 and October 1, 2007. (R. 340-41.) At Plaintiff's October 10, 2007 appointment, her clinical status still was noted as "[w]orsening" related to her seventeen-year-old son's relationship with a twenty-seven-year-old woman. (R. 339.) While Plaintiff reported that the increased dosage of Lexapro had helped her depression, she had run out of the medication and was feeling depressed again. (*Id*.) Dr. Purohit renewed Plaintiff's prescription and scheduled a return visit for four weeks later. (*Id*.)

At the return visit on November 7, 2007, Plaintiff reported "feeling better." (R. 338.) She provided that her son was no longer with the twenty-seven-year-old woman, which was a "big relief for stress"; however, she complained about "frequent awakening" and an inability to sleep "in complete darkness" or she "will get panicky." (*Id*.)

February 2008 through January 2009 treatment notes from Dr. Purohit document that Plaintiff's clinic status was "[m]aintaining." (R. 393-95, 398-418.) Plaintiff reported doing okay, that her depression was not too bad, and that she had been feeling good with the present medications. (*Id*.) Dr. Purohit therefore continued Plaintiff on the same medications during this period. On May 22, 2008, Dr. Purohit completed a Southwest Counseling Case Review form on which he assessed Plaintiff a GAF score of fifty-five. (R. 413.) At a subsequent appointment on May 29, 2008, Plaintiff reported that she had been feeling aggravated and easily angered, but she denied feeling depressed. (R. 411.) On July 24, 2008, Plaintiff told Dr. Purohit that her depression and anxiety had improved. (R. 402.) He found her mood and thinking stable, and noted that she was alert and

8

oriented.  (*Id*.)

On August 27, 2008, Plaintiff reported feeling more depressed because her thirteen-year-old son had moved to Chicago to live with his dad and her eighteen-year-old son had been hit by a car while riding his bike.  (R. 401.)  About a month later, however, Plaintiff denied feeling depressed and reported her anxiety as being "not too bad." (R. 400.)  Plaintiff continued to report minimal depression and anxiety at her appointments during the last three months of 2008. (R. 394, 398-99.)

Despite the death of her aunt on Christmas Day 2008, at an appointment on January 16, 2009, Plaintiff reported doing okay and that her anxiety and depression were not too bad.  (R. 393.)  However, at an appointment a few days following her father's February 10, 2009 death, Plaintiff's clinical status was reported to be "[w]orsening" and she informed Dr. Purohit that she was having chest pains, and was feeling angry, lonely, and sad.  (R. 392.)  Two weeks later, Plaintiff's status continued to be labeled "[w]orsening" as she reported feeling very depressed, was tearful, and reported chest pains due to stress.  (R. 391.)  At this appointment on February 27, 2009, Dr. Purohit continued Plaintiff on Lexapro and Xanax and added Remeron.  (*Id*.)

At Plaintiff's March 13, 2009 appointment, Dr. Purohit discontinued Remeron after Plaintiff reported sleeping difficulties and feeling strange and nervous since taking it.  (R. 390.)  Plaintiff indicated that she was feeling better, although Dr. Purohit found her mood sad and anxious.  (*Id*.)  When Dr. Purohit saw Plaintiff again on April 10, 2009, she was still feeling better, although he found her to be anxious and her mood sad.  (R.

9

389.)

June 5, 2009 treatment notes reflect that Plaintiff complained about feeling angry lately, specifically around her son. (R. 387.) Her condition was noted as "[w]orsening" and Dr. Purohit added Seroquel to her medications. (*Id*.)

Plaintiff's treatment records from Southwest Counseling next reflect a psychiatric evaluation on December 1, 2009. (R. 507-10.) Plaintiff reported feeling depressed, having poor concentration, crying a lot lately, and that she was getting real anxious, desperate, and having panic attacks two to three times a day. (R. 507.) She indicated, however, that she was sleeping well with Seroquel and that her depression was better with her present medications and treatment. (*Id*.) Dr. Purohit judged her prognosis as "guarded[.]" (R. 510.)

On January 26, 2010, Plaintiff's mental status was characterized as "[w]orsening." (R. 506.) She reported "feeling very depressed" due to her nineteen-year-old son being charged with attempted murder and her boyfriend being in jail. (*Id*.) Plaintiff also complained of memory problems. (*Id*.) Dr. Purohit added Wellbutrin to Plaintiff's then current medications and increased her dosage of Seroquel. (*Id*.)

Plaintiff's status had improved by her appointment on February 9, 2010. She reported that the boy who her son had stabbed decided to drop the charges. (R. 505.) Dr. Purohit reduced Plaintiff's dosage of Seroquel because Plaintiff felt it was too strong. (*Id*.) A month later, Plaintiff indicated that she was again depressed after receiving a positive HIV test. (R. 504.) Another month later, at her April 6, 2010 appointment,

Plaintiff complained about feeling very angry and depressed, relating that her son had received a prison term of sixteen years for assault and battery and attempted murder, and her boyfriend received a prison term of five years.  (R. 503.)  Her condition was indicated as "[w]orsening" at this appointment.

During the following few months, Plaintiff reported feeling better physically and mentally.  (R. 497-502.)  However, treatment notes on October 27, 2010 reflect that Plaintiff's condition was "[w]orsening."  She reported that her sixteen-year-old son had moved from Chicago to live with her and that this had been very stressful and left her feeling depressed.  (R. 496.)  January 26, 2011 treatment notes reflect that Plaintiff's clinical status was "[m]aintaining", although she indicated that she had been out of her medications for two months.  (R. 495.)  Plaintiff reported that her son was in school and doing much better.  (*Id*.)  At Plaintiff's request, her Xanax was discontinued at this appointment.

In February and March 2011, Plaintiff's status was noted as "[w]orsening.  (R. 493-94.)  She reported a lot of stress, anxiety, and worry because her fifteen-year-old son had been cutting himself.  (R. 494.)  Plaintiff appeared upset, very anxious, and tearful at her March 25, 2011 appointment.  (R. 493.)  She discussed her son's troubles and reported that he was getting treatment at Southwest Counseling.  (R. 493.)  Plaintiff complained of periodic panic attacks and sleep problems.  (*Id*.)  Dr. Purohit resumed her Xanax prescription at this appointment.  (*Id*.)

At her appointments in May and early June 2011, Plaintiff continued to report a lot

11

of stress related to her son and depression.  (R. 490-91.)  At the later appointment,

Plaintiff also indicated that she was not sleeping well.  (R. 490.)  On June 29, 2011, a

clinical status of "[w]orsening" was noted.  (R. 489.)  Plaintiff related that she was scared

that the man who had assaulted her and tried to break into her house a year earlier would

come after her again.  (R. 489.)  In response, Dr. Purohit increased Plaintiff's dosage of

Seroquel.  (*Id*.)

A month later, on July 27, 2011, Plaintiff reported feeling calmer since the

increase in her Seroquel dosage.  (R. 488.)  Her mood was stable; she was alert and

oriented.  (*Id*.)  Plaintiff reported feeling depressed at her next appointment on August 29,

2011 (R. 486.), and her mood was reported as anxious a month later.  (R. 486.)  These are

the last treatment notes from Southwest Counseling in the administrative record.

In the meantime, on January 4, 2008, Plaintiff was seen by a State agency

consultative examiner, Dr. Atul C. Shah, for the purpose of a psychological evaluation.

(R. 351-53.)  Dr. Shah noted that Plaintiff had frequent crying spells while describing her

conditions to him.  (R. 351.)  Plaintiff reported that she had been sad and depressed since

she was a teenager, but that her depression had worsened in the last two years.  (*Id*.)  She

described feeling depressed every day, all of the time, for periods of weeks and months,

and feeling helpless and hopeless.  (*Id*.)  She reported that she cries for no reason, has no

motivation, and is withdrawn.  (*Id*.)  Plaintiff informed Dr. Shah that she stays in, does

not like to talk to anyone, has disturbed memory, concentration, and sleep, and has had no

relationship with anyone for the last two years.  (*Id*.)  Plaintiff reported anxiety attacks for

12

the previous two years, explaining that she hyperventilates, has chest pains, and her heart rate increases. (*Id*.) She indicated that these attacks last thirty to forty minutes, occur three to four times a week, and sometimes multiple times a day. (*Id*.)

Plaintiff also told Dr. Shah that she has no hobbies or interests anymore, stays in her room and does nothing, and wakes up angry every day. (R. 352.) She indicated that she is able to take care of daily chores by herself, makes some small meals, but does not like to go outside, even for shopping. (*Id*.) Dr. Shah found Plaintiff to be depressed, anxious, fearful, and friendly. (*Id*.) He noted her affect as blunt. (*Id*.) Deficits in immediate and recent memory were appreciated. (R. 353.) Dr. Shah diagnosed Plaintiff with chronic pain disorder and major depressive disorder, recurrent, with psychotic features, in partial remission. (*Id*.) He assessed Plaintiff a GAF score of fifty and gave her a "fair" prognosis. (*Id*.) In Dr. Shah's opinion, Plaintiff would not be able to manage benefit funds. (*Id*.)

A Psychiatric Review Technique form was completed by a non-examining State agency consultant, Ms. Sheila C. Williams-White, on January 22, 2008. (R. 355-67.) Ms. Williams-White identified Plaintiff as experiencing major depressive disorder, recurrent, with psychotic features and chronic panic disorder. (*Id*.) As a result of Plaintiff's disorders, Ms. Williams-White found that Plaintiff had mild limitations in her activities of daily living and maintaining concentration, persistence, or pace. (R. 365.) She found moderate limitations in maintaining social functioning. (*Id*.)

On January 22, 2008, Ms. Williams-White also completed a Mental RFC

13

Assessment, noting moderate limitations in the following abilities: understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (R. 369-70.) Ms. Williams-White concluded that Plaintiff's mental status improves as her social stressors are resolved. (R. 371.) Based on her examination of Plaintiff, Ms. Williams-White found normal orientation, thought process, and speech, and determined that Plaintiff's memory was grossly intact. (*Id.*)

Ms. Williams-White remarked that Plaintiff's activities of daily living are limited due to physical problems, and that Plaintiff needs encouragement due to her depression. (*Id.*) Ms. Williams-White found that Plaintiff is able to maintain her household and get around, but has some trouble with her memory and following written instructions and needs assistance with coping skills. (*Id.*) She concluded that Plaintiff is partially credible and that her impairments may produce the alleged symptoms, but not with the intensity, persistence, and limiting effects claimed. (*Id.*) Ms. Williams-White indicated that Plaintiff is capable of engaging in simple work activities, responding to simple routines independently, tolerating low stress social demands, and adapting to simple routine changes. (*Id.*)

## III.    Hearing Testimony Before the ALJ

Plaintiff was thirty-eight years old when she appeared for the hearing before ALJ Fernandez Rice on December 8, 2011. She had a high school education and past relevant

14

work experience as an accounting clerk, day care provider, cashier, trophy packer, painter, and laborer.  Plaintiff had not performed work at the level of substantial gainful activity since October 5, 2005, the alleged onset date.  She claimed disability due to back pain caused by nerve damage, depression, and anxiety.  (R. 241.)

### A.     Plaintiff's testimony

During the hearing, Plaintiff testified that she last worked in September 2010, removing asbestos.  (R. 35.)  She testified that she was laid off from this position because she was having too much pain and her pain caused her to arrive late, leave early, and miss work for doctor visits.  (R. 35.)  Plaintiff  stated that she uses a cane all the time and a back brace.  (R. 35-36.)  The cane helps her stand, relieves the pressure on her back,  and prevents her from falling. (R. 36.)  Plaintiff testified that on a typical morning, after she wakes, she has to wait at least ten minutes for the numbness to leave her legs before she can stand.  (R. 37.)  She then gets dressed and does a little housework, although she testified that she has to sit for at least five to ten minutes or lay down on a heating pad to relieve her pain.  (R. 37.)  Plaintiff testified that she prepares meals, does the laundry, and washes the dishes, but that she has to rest in a chair next to the sink after standing for a couple of minutes and needs someone to carry the laundry basket to the washing machine. (R. 37, 50.)  She conveyed that she needs to lay down and rest for about fifteen to twenty minutes, at least four to five times on a typical day.  (R. 50-51.)

Plaintiff further testified that she can stand in one place for ten to fifteen minutes before she has to walk around or lean against a wall and that she can sit in one place for

about twenty minutes.  (R. 47.)  She can bend, squat, and pick up things from the floor, but with trouble.  (R. 48.)  Plaintiff testified that when she tries to climb stairs, she falls down.  (R. 51.)  Plaintiff also testified that she uses the bus for transportation and can walk the one to three blocks to the bus stop by taking breaks and/or walking at a slow pace.  (R. 38, 47.)  According to Plaintiff, neighbors or family members take her to the grocery store and help her load and unload the bags.  (R. 38.)

With respect to her mental impairments, Plaintiff testified that her anxiety is triggered by being alone.  (R. 39.)  She denied becoming anxious when interacting with co-workers or other people, although she indicated that her depression affects her ability to interact with people.  (*Id*.)  She does not socialize with friends or family and does not attend social gatherings or parties.  (R. 50.)  Plaintiff testified that her depression also impacts her mental concentration in that she tends to forget things, has to read something multiple times to understand it, and has to watch a movie two to three times "to get its concept."  (R. 40-41.)

### B.    The vocational expert's testimony

The ALJ solicited testimony from Vocational Expert ("VE") James Lozer to determine whether sufficient jobs are available for someone with Plaintiff's functional limitations.  Specifically, the ALJ asked the VE about job availability for a hypothetical individual of Plaintiff's age, education, and work experience, who has the following limitations: capable of light work; needs a sit/stand option; can never climb ladders, ropes, or scaffolds; can only occasionally stoop, crouch, crawl, climb ramps or stairs; can

16

never kneel; can frequently balance, but with use of a hand-held assistive device; needs to avoid even moderate exposure to excessive vibration and unprotected heights; and can engage in only simple, routine, and repetitive tasks.  (R. 56-57.)

The VE testified that Plaintiff could not do her past work with the identified restrictions.  (R. 58.)  The ALJ then asked whether there are a significant number of jobs in the national economy that Plaintiff could perform.  (*Id*.)  Before answering, the VE first asked the ALJ to clarify whether Plaintiff needs to use a cane when walking and standing, which would limit her ability to do more than one-handed tasks while standing.  (*Id*.)  The ALJ indicated that Plaintiff is so limited.  (*Id*.)  The VE then testified that there are significant jobs in the sedentary, unskilled category that Plaintiff could perform with her restrictions such as inspection and security monitoring.  (R. 58-59.)  If the individual also requires two to three unscheduled ten minute breaks, needs to elevate her legs ten to twenty degrees for two hours of an eight hour work day, and would miss three workdays a month, the VE opined that there would be no full-time competitive employment available.  (R. 59-60.)

## IV.   The ALJ's Application of the Disability Framework

Under the Social Security Act (alternatively "Act"), disability insurance benefits and supplemental security income "are available only for those [individuals] who have a 'disability.' "  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  In relevant part, the Act defines "disability as the

> inability to engage in any substantial gainful activity by

17

> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period of
> not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  An individual is found to

have a "disability" for purposes of the Act, "only if h[er] physical or mental impairment

or impairments are of such severity that [s]he is not only unable to do h[er] previous work

but cannot, considering h[er] age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy . . .."  42 U.S.C.

§ 423(d)(2).

An ALJ considering a disability claim is required to follow a five-step process to

evaluate the claim.  20 C.F.R. § 404.1520(a)(4).  If the ALJ determines that the claimant

is disabled or not disabled at a step, the ALJ makes his or her decision and does not

proceed further.  *Id.*  However, if the ALJ does not find that the claimant is disabled or

not disabled at a step, the ALJ must proceed to the next step.  *Id.*

The ALJ's five-step sequential process is as follows:

1. Whether the claimant is currently engaged in substantial gainful activity.  If she is, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

2. Whether the claimant has a severe medically determinable physical or mental impairment that meets the duration requirement of the regulations and significantly limits the claimant's ability to do basic work activities.  If the claimant does not have such an impairment, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii), (c).

3. Considering the medical severity of the claimant's impairment(s), whether any impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant has an impairment that meets any

18

Listing, she is determined to be disabled regardless of other factors.  20 C.F.R. § 404.1520(a)(4)(iii).

4.     Considering the claimant's residual functional capacity ("RFC") and past relevant work, whether the claimant can perform her past relevant work.  If she can, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

5.     Considering the claimant's RFC, age, education, and past work experience, whether she can do other work.  If there is no such work that the claimant can perform, the ALJ must find that she is disabled.  20 C.F.R. § 404.1420(a)(4)(v).

*See Walters v. Comm'r of Soc. Sec'y*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The burden of proof is on the claimant through the first four steps.  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).  If the analysis reaches the fifth step, the burden shifts to the Commissioner.  *Id.*

At the first step, ALJ Fernandez Rice found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 30, 2005.  (R. 16.)  At the second step, she found that Plaintiff had the following severe impairments: status post lumbar fusion at L4-L5, lumbar spine neuropathy, depression, and anxiety.  (*Id.*)  Next, the ALJ concluded that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment.  (*Id.*)  Between the third and fourth steps, the ALJ determined that Plaintiff had the following residual functional capacity: to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[2]

_____

[2]The regulations define "light work" as follows:

[I]nvolv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted

except she would require a sit or stand option allowing her to sit or stand alternatively at will, provided she is not off task more than ten percent (10%) of the workday; could never kneel or climb ladders, ropes, or scaffolds; could frequently balance with the use of a handheld assistive device; could occasionally climb ramps or stairs, stoop, crouch, and crawl; must avoid even moderate exposure to unprotected heights and excessive vibration; and that the work must be limited to simple, routine, and repetitive tasks.  (R. 18-19.)

At the fourth step, the ALJ found that Plaintiff was unable to perform any past relevant work.  (R. 23.)  Reaching the fifth step, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and RFC.  (R. 24-25.)  The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of the decision. (R. 25.)

## V.   Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited.

---

may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §§ 404.1567(b), 416.967(b).  If a claimant is found capable of light work, the regulations provide that he or she also is found capable of "sedentary work," unless there are additional limiting factors like an inability to sit for long periods of time.  *Id.*

Th[e] court must affirm the Commissioner's decision unless "the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec'y*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks and citations omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec'y*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). If substantial evidence supports the Commissioner's decision, the decision "must be affirmed even if the reviewing court would decide the matter differently, . . . and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard " 'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' ") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v.*

21

*Comm'r of Soc. Sec'y*, 245 F.3d 528, 535 (6th Cir. 2001) (citations omitted).  However, the court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## VI.   Analysis

Plaintiff asserts three challenges to the ALJ's decision.  First, she claims that substantial evidence does not support the ALJ's determination at step three.  Specifically, Plaintiff challenges the ALJ's determination that Plaintiff did not satisfy the "B" criteria requirements associated with Listing 12.04 for affective disorders.  Next, Plaintiff claims that the ALJ failed to properly account for her "moderate" limitations in concentration, persistence, and pace in the RFC assessment and corresponding hypothetical question to the VE.  Finally, Plaintiff asserts that the ALJ violated the treating physician rule in evaluating Dr. Singh's opinions.

### A.   Whether the ALJ's determination at step three is supported by substantial evidence

Plaintiff contends that the ALJ should have found that her mental impairment met Listing 12.04 at the third step of the analysis, and therefore found Plaintiff disabled within the meaning of the Social Security Act.  (Pl.'s Br. in Supp. of Mot. at 13-15.)  Plaintiff argues that she satisfies the criteria in section B of the Listing, contrary to the ALJ's conclusion.  (*Id*.)

Listing 12.04 relates to "affective disorders."  20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.00.  In order to meet this listing, a claimant must demonstrate that she satisfies the

22

criteria in paragraph B or C of the section.  *Id*. § 12.04.  To satisfy paragraph B, the claimant's disorder must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *Id*.

A restriction is "marked" when the degree of limitation is "more than moderate but less than extreme."  20 C.F.R., Pt. 404, subpt. P, App. 1 § 12.00(C).  The regulations further provide that "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  *Id*.

Evaluating the "paragraph B" criteria, ALJ Fernandez Rice found that Plaintiff has no restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation.  (R. 17-18.)  Here, Plaintiff challenges the first three findings.

With respect to restrictions in activities of daily living, Plaintiff argues that she in fact has marked restrictions as the evidence reflects the following: (1) she has problems bending to put on shoes, socks, and pants; (2) cannot hold her arms up long enough to care for her hair; (3) is limited to ten to fifteen minutes to prepare meals because she cannot stand too long; (4) can do only a bit of housework before needing to rest; and (5) can do dishes, but only with a chair next to her so she can take breaks.  (Pl.'s Br. in Supp.

23

of Mot. at 14-15.)  None of these limitations, however, relate to Plaintiff's mental

disorder.  Rather they arise from her physical ailments, specifically her back pain.

      With respect to social functioning, Plaintiff argues that the ALJ ignored evidence

reflecting that she does not go outside often and does not want to leave her house, has lost

interest in doing things, has problems getting along with family, friends, neighbors, and

others because she is too depressed, and is not interested in friends or a social life.  (*Id.* at

15.)  The ALJ acknowledged Plaintiff's testimony that she has no social life and problems

getting along with others; nevertheless, the ALJ concluded that Plaintiff has only mild

difficulties in social functioning based on record evidence indicating that she in fact

interacts with neighbors, family members, and friends, and gets along "fine" with

authority figures.  (R. 17.)  The ALJ noted that Plaintiff's therapy notes also reflect that

she had a pleasant and cooperative demeanor.  (*Id.*)

      The regulations provide that "social functioning" refers to a claimant's "capacity

to interact independently, appropriately, effectively, and on a sustained basis with other

individuals."  20 C.F.R., Pt. 404, subpt. P, App. 1 § 12.00(C).  The regulations further

state that "[s]ocial functioning includes the ability to get along with others, such as family

members, friends, neighbors, grocery clerks, landlords, or bus drivers."  *Id.*  Examples of

impaired social functioning are "a history of altercations, evictions, firings, fear of

strangers, avoidance of interpersonal relationships, or social isolation."  *Id.*  A claimant

may demonstrate "strength in social functioning by such things as [his or her] ability to

initiate social contacts with others, communicate clearly with others, or interact and

24

actively participate in group activities." *Id*. The ALJ also considers "cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity." *Id*.

Guided by the regulations, this Court finds substantial evidence in the record to support the ALJ's finding that Plaintiff suffers only mild difficulties in social functioning. There is evidence showing that Plaintiff has some fear of strangers (more specifically a fear of someone breaking into her home and/or assaulting her), avoids interpersonal relations, and isolates herself. Nevertheless, there also is substantial evidence showing that when Plaintiff interacts with people, she has no difficulties. She relies on family and friends to take her grocery shopping, has no apparent problems interacting with store clerks and the people she encounters when using public transportation, and there is no record of Plaintiff having difficulty working with co-workers when she worked. Further, it is noted throughout Plaintiff's treatment records that she was cooperative, pleasant, polite, and friendly. (*See, e.g.*, R. 393-94, 398, 400, 486-88, 495.) Plaintiff points out that the treatment notes also state that she was observed to be sad, depressed, and anxious, and reported that she was experiencing problems sleeping. (Pl.'s Br. in Supp. of Mot. at 15.) The relevant question here, however, is whether these feelings and/or problems interfered with Plaintiff's ability to function socially, and substantial evidence supports the ALJ's finding that they did not.

Plaintiff maintains that the ALJ also erred in evaluating the extent to which her mental disorders affect her concentration, persistence, and pace. (Pl.'s Br. in Supp. of

Mot. at 15-16.)  Based on the evidence in the record, the ALJ concluded that the impact is only moderate.  (R. 18.)  The ALJ acknowledged Plaintiff's testimony that she has to re-read things, has a hard time following movies, is forgetful, and needs to write things down.  (*Id*.)  The ALJ also acknowledged that Plaintiff reported difficulty handling stress, change in routine, and following written instructions, but noted that Plaintiff also reported an ability to follow spoken instructions well.  (*Id*.)  Plaintiff argues that "[t]he ALJ fails to provide an explained conclusion as to why such evidence results in only 'moderate' restrictions."  (Pl.'s Br. in Supp. of Mot. at 16.)

It is Plaintiff's burden, however, to show that she meets or equals a listed impairment.  Plaintiff identifies no evidence in the record suggesting more than moderate difficulties with concentration, persistence, and pace.  But even if Plaintiff satisfied her burden and demonstrated marked limitations in this area, that alone would be insufficient to satisfy the paragraph B criteria.  As stated earlier, to satisfy Listing 12.04, a claimant must have marked limitations in *at least two* of the three specified criteria *or* one marked limitation in a functional criteria *and* repeated episodes of decompensation, each of extended duration.  *See, supra*.  The ALJ did not conclude and Plaintiff does not demonstrate marked limitations in a second criteria, and the ALJ found that Plaintiff had experienced no episodes of decompensation of extended duration.  (R. 18.)  Plaintiff does not challenge this latter finding here.

As such, the Court rejects Plaintiff's claim of error at step three of the ALJ's analysis.

26

**B.**    **Whether the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, and pace in her RFC assessment and hypothetical question posed to the vocational expert**

Plaintiff contends that by limiting Plaintiff to only "simple, routine, and repetitive tasks" (R. 19), the ALJ failed to account for her moderate limitations in maintaining concentration, persistence, and pace when assessing Plaintiff's RFC and questioning the VE.  (Pl.'s Br. in Supp. of Mot. at 17-18.)

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy v. Comm'r of Soc. Sec'y*, 594 F.3d 504, 516 (6th Cir. 2010). Whether an ALJ's question sufficiently portrays a claimant's moderate limitations in concentration, persistence, or pace is an issue frequently litigated in the courts.  In the Sixth Circuit, there is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration, persistence, or pace, and only limits the individual to unskilled work or simple, routine tasks.[3]  There

_____

[3]*See, e.g., Benton v. Comm'r of Soc. Sec'y*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007) (finding that the ALJ's hypothetical was insufficient to suitably accommodate the plaintiff's concentration limitations where the ALJ found that the Plaintiff had a moderate deficiency in her ability to maintain concentration, persistence, and pace and the ALJ's question only advised that the " 'Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.' "); *Green v. Comm'r of Soc. Sec'y*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) (concluding, where the claimant was found to have "moderate" concentration problems, that " 'moderate' concentration problems . . . need to be included or accommodated in some suitable fashion

(continued...)

27

also is relevant authority, however, finding that the ALJ formed an accurate hypothetical

despite the omission of a moderate concentration, persistence, or pace limitation.[4]

In short, there is no absolute rule requiring remand whenever an ALJ's

hypothetical fails to expressly include a moderate limitation in concentration, persistence,

and pace.  Instead, district courts must look at the record as a whole and determine if the

ALJ's hypothetical question and RFC are compatible.  *See Hess v. Comm'r of Soc. Sec'y*,

No. 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v.*

*Comm'r of Soc. Sec'y*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30,

_____

[3](...continued)

in the hypothetical question . . . simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."); *Long v. Comm'r of Soc. Sec'y*, No. 09-14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) (finding that the ALJ erred by failing to incorporate the Plaintiff's moderate difficulties with regard to concentration, persistence, or pace into the controlling hypothetical); *Perkins v. Comm'r of Soc. Sec'y*, No. 10-10089, 2010 WL 5634379, at *9 (E.D. Mich. Dec. 14, 2010) (same).

[4]*See, e.g., Infantado v. Astrue*, 263 F. App'x 469, 477 (6th Cir. 2008) (finding that substantial evidence supported the ALJ's decision where, although a psychiatrist found "moderate" limitations in the claimant's ability to maintain attention and concentration for extended periods, the same psychiatrist also noted the claimant's daily activities and ultimately concluded the claimant was capable of performing simple tasks on a sustained basis); *Taylor v. Comm'r of Soc. Sec'y*, No. 10-12519, 2011 WL 2682682, at *8 (E.D. Mich. May 17, 2011) ("[T]his Court finds that Dr. Marshall's findings that Plaintiff has moderate limitations in concentration, persistence, and pace have to be considered in conjunction with his ultimate conclusion (twice reached) that, despite the concentrational limitations, Plaintiff could perform unskilled work on a 'sustain[] basis.' "); *Hess v. Comm'r of Soc. Sec'y*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies.  However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations . . . are not incompatible.")

2010).

On January 22, 2008, state agency psychologist Sheila Williams-White completed two forms concerning Plaintiff.  On one form she noted that Plaintiff had only "mild" difficulties in maintaining concentration, persistence, or pace, and could engage in simple work activities. (R. 22, 365, 371.)  On a second, form, she indicated that Plaintiff had "moderate" limitations in "[t]he ability to maintain attention and concentration for extended periods."  (R. 369.)  The record does not contain the express opinion of any other doctor that Plaintiff has moderate limitations with respect to concentration, persistence, or pace.  The ALJ combined the state agency doctor's findings, concluding that Plaintiff suffered moderate limitations in her ability to maintain concentration, persistence, and pace, but that she could function on a sustained basis and engage in light work limited to simple, routine, and repetitive tasks.  (R. 19-23.)  As in *Hess* and *Lewicki*, the ALJ's finding of a moderate limitation in concentration, persistence, or pace has to be considered in conjunction with the broader findings, which indicate that Plaintiff could successfully perform simple occupational work.  *See also Smith v. Comm'r of Soc. Sec'y*, No. 13-10862, 2013 WL 6094745, at *8 (E.D. Mich. Nov. 20, 2013) (finding the ALJ's RFC sufficient despite omitting the claimant's restrictions in concentration, persistence, and pace, where a State agency doctor ultimately concluded that the claimant retained the ability to perform unskilled tasks on a sustained basis); *Young v. Comm'r of Soc. Sec'y*, No. 10-11329, 2011 WL 2601014, at *10 (E.D. Mich. May 23, 2011) (finding substantial evidence to support the ALJ's decision, noting that "[a]lthough Plaintiff correctly cites

29

the moderate limitations noted in the assessment, Plaintiff fails to mention that the same

assessment also concluded that Plaintiff is 'capable of unskilled work.' "), *adopted by*

2011 WL 2600599 (E.D. Mich. June 30, 2011).

For these reasons, the Court finds no error in the ALJ's RFC or the hypothetical

question posed to the VE.

### C.   Whether the ALJ violated the treating physician rule

Plaintiff argues that the ALJ violated the treating physician rule by failing to

accord the proper weight to the opinion of Plaintiff's treating physician, Dr. Singh, and by

failing to specify the weight assigned to Dr. Singh's opinion.  (Pl.'s Br. in Supp. of Mot.

at 18.)

The treating physician rule requires the ALJ to give "controlling weight" to the

medical opinion of a claimant's treating physician "as long as it 'is well-supported by

medically acceptable . . . diagnostic techniques' and 'not inconsistent with the other

substantial evidence' in the record." *Sawdy v. Comm'r of Soc. Sec'y*, 436 F. App'x 551,

553 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides not to

afford a treating physician's opinion controlling weight, "the rule still requires the ALJ to

fully consider it in accordance with certain factors . . . and to provide 'good reasons' for

discounting the opinion– i.e., reasons 'sufficiently specific to make clear to any

subsequent reviewers the weight . . . given to the . . . opinion and the reasons for the

weight.' " *Id.* (citations and brackets omitted).  The factors the ALJ must consider are set

forth in 20 C.F.R. § 404.1527(c)(1)-(6) as the following non-exhaustive list: "the length

30

of the treatment relationship and the frequency of examination, the nature and extent of

the treatment relationship, supportability of the opinion, consistency of the opinion with

the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of

Soc. Sec'y*, 378 F.3d 541, 544 (6th Cir. 2004).

These procedural rules are mandatory. *See Rogers v. Comm'r of Soc. Sec'y*, 486

F.3d 234, 242 (6th Cir. 2007). In *Rogers*, the Sixth Circuit identified two rationales for

requiring the ALJ to specifically identify the weight accorded the treating physician's

opinion and reasons for that weight:

> First, the explanation " 'let['s] claimants understand the disposition of their
> cases,' particularly where a claimant knows that his physician has deemed
> him disabled and therefore 'might be bewildered when told by an
> administrative bureaucracy that he is not, unless some reason for the
> agency's decision is supplied.' " *Wilson*, 378 F.3d at 544 (quoting *Snell v.
> Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Second, the explanation "ensures
> that the ALJ applies the treating physician rule and permits meaningful
> appellate review of the ALJ's application of the rule." *Id.*

*Id.* at 242-43. The notice requirement, the court further explained, ensures that "each

denied claimant receives fair process[.]" *Id.* at 243. As such, under Sixth Circuit

precedent, the Commissioner's decision denying benefits must be reversed and the matter

remanded if the ALJ failed to follow this procedural rule. *Id.* In other words, "[the]

failure to follow the procedural requirement of identifying the reasons for discounting the

[treating physician's] opinions and for explaining precisely how those reasons affected

the weight accorded the opinions denotes a lack of substantial evidence, even where the

conclusion of the ALJ may be justified based upon the record." *Id.*

Here, Plaintiff's treating physician, Dr. Singh, completed two forms documenting her opinion of Plaintiff's impairments and condition. The form completed in 2008– one and a half years into Dr. Singh's treatment of Plaintiff– reflects a diagnosis of L4-L5 disc herniation with radiculopathy. (R. 382.) Dr. Singh also indicated that Plaintiff needs to use a cane and requires assistance with meal preparation, shopping, laundry, and housework. (*Id*.) Dr. Singh opined that Plaintiff can not work at her usual occupation or at any job for one year. (*Id*.)

Dr. Singh completed another questionnaire on September 30, 2009, where she indicated that Plaintiff has constant pain with varying severity in the lower back, radiating to the leg that worsens with prolonged sitting and standing. (R. 449.) Dr. Singh identified tenderness of Plaintiff's hips and back and positive straight leg raises as clinical findings and objective signs of Plaintiff's impairments. (*Id*.) As relevant to the present issue, Dr. Singh indicated that Plaintiff would need two to three scheduled breaks of ten minutes each during an eight hour work day, would need to elevate her legs ten to twenty degrees with prolonged seating, should never stoop or crouch/squat, and could occasionally lift and carry less than ten pounds. (R. 451.) She also noted that Plaintiff is likely to miss work about three days per month as a result of her impairments or treatment. (R. 452.)

The ALJ did not incorporate these restrictions in the RFC. (R. 18-19.) In response to the opinions set forth in the 2009 assessment, the ALJ only commented that "[Dr. Singh's] restrictions are generally supportive of light, low stress work." (R. 21.) The

32

ALJ wrote the following in response to the opinions stated in the form completed by Dr.

Singh in 2008:

> [Her] 2008 Medical Needs Form appears to be sympathetic to the claimant
> and underestimates the claimant's abilities.  The records through October
> 2008 revealed the claimant had only minimal clinical findings,
> unremarkable neurological examinations, and only conservative treatment.
> Further, the issue of disability is ultimately reserved to the Commissioner ...
> In considering Dr. Singh's reports, I find a light exertional level with the
> established exertional, postural, and environmental limitations appropriately
> reflects the claimant's physical limitations.

(R. 21.)  For the reasons that follow, the Court finds error in the ALJ's treatment of Dr.

Singh's opinions.

First, the ALJ's statements concerning Dr. Singh's opinions are not sufficiently

specific to inform Plaintiff and a reviewing court of the ALJ's reasons for not giving

those opinions controlling weight, the weight given to those opinions, or the reasons for

that weight.  The Commissioner argues that the ALJ "reasonably concluded that [Dr.

Singh's 2008 and 2009] opinions were not well supported by diagnostic documentation."

(Def.'s Br. in Supp. of Mot. at 12.)  However, the ALJ did not provide *any* reason for

discounting the opinions Dr. Singh offered on the 2009 Physical RFC questionnaire.[5]  The

_____

[5]Rather, the ALJ appears to have accepted Dr. Singh's 2009 opinions but found them
supportive of light work.  As set forth earlier, however, light work requires "lifting no more
than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds[,] . . . a good deal of walking or standing, or . . . sitting most of the time with some
pushing and pulling of arm or leg controls."  20 C.F. R § 404.1567(b).  But Dr. Singh opined
that Plaintiff could only occasionally lift and carry less than ten pounds, could stand/walk for
only two to four hours of an eight hour work day, and could not sit for long periods of time.
(R. 450-51.)

33

ALJ's comments addressed only the 2008 Medical Needs Form and the records through October 2008. (R. 21.)

The Commissioner nevertheless argues that "[t]he ALJ . . . recognized that the clinic notes from October 2008 through September 2009 are substantially similar [to the records through October 2008] . . .." (Def.'s Br. in Supp. of Mot. at 12.) The Court does not find such a statement in the ALJ's decision, however. Moreover, the treatment records after October 2008 relating to Plaintiff's physical ailments are not substantially similar to those preceding that date. For example, while the ALJ states that the earlier records reflect "only minimal clinical findings, unremarkable neurological examinations, and only conservative treatment (R. 21), subsequent physical exams revealed *positive* straight leg tests, spinal tenderness, and reduced range of motion.[6] (R. 319, 449, 466-70.)

Again, the Sixth Circuit has held that the Commissioner's decision denying benefits *must* be reversed and remanded "even though 'substantial evidence otherwise supports the decision of the Commissioner,' when the ALJ fails to give good reasons for discounting the opinion of the claimant's treating physician." *Friend v. Comm's of Soc. Sec'y*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Wilson*, 378 F.3d at 543-46 (6th Cir. 2004)). Although there are exceptions to this rule, none are applicable here.[7] Where

---

[6]The ALJ in fact appears to have overlooked some of this evidence, as she indicated earlier in her decision that there is no evidence of limitation of motion or positive straight-leg raising tests. (R. 17.)

[7]In *Wilson v. Commissioner of Social Security*, the Sixth Circuit observed that, in
(continued...)

the ALJ has violated the procedural "good reason" rule, this Court is not at liberty to cull from the record the evidence that would have supported the ALJ's decision.  *See Munn v. Comm'r of Soc. Sec'y*, No. 12-14832, 2014 WL 1230017, at * (E.D. Mich. Mar. 25, 2014) (citing *Hyatt Corp. v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order.")).  Instead, "[a] failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.' "  *Friend*, 375 F. App'x at 551 (quoting *Rogers v. Comm'r of Soc. Sec'y*, 486 F.3d 234, 243 (6th Cir. 2007)).

As such, the Court finds that the ALJ's error with respect to her treatment of Dr. Singh's opinions requires reversal of the Commissioner's decision denying Plaintiff benefits and remand to the Commissioner for further proceedings consistent with this opinion.

---

[7](...continued)
some circumstances a violation of the "good reason" rule might be "harmless error" if: (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)– the provision of the procedural safeguard of reasons– even though she has not complied with the regulation."  378 F3d 541, 547 (2004).  The appellate court subsequently explained that "[i]n the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments."  *Friend v. Comm'r of Soc. Sec'y*, 375 F. App'x 543, 551 (6th Cir. 2010) (citations omitted).

**VII.    Conclusion**

For the reasons set forth above, this Court rejects Plaintiff's challenge to the ALJ's determination at step three of her analysis and Plaintiff's claim that the ALJ failed to properly account for her moderate limitations in concentration, persistence, and pace in the RFC assessment and corresponding hypothetical question to the vocational expert. The Court finds, however, that Plaintiff raises a valid challenge to the ALJ's treatment of treating physician Dr. Singh's opinions.  The ALJ violated the regulations when evaluating those opinions.

Accordingly,

**IT IS ORDERED**, that Plaintiff's motion for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED**, that Defendant's motion for summary judgment is **DENIED**;

**IT IS FURTHER ORDERED**, that the decision of the Commissioner is reversed and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

s/ Linda V. parker_____
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 29, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 29, 2014, by electronic and/or U.S.

First Class mail.

s/ Richard Loury
Case Manager